***********
Having reviewed the competent evidence of record, and having the benefit of the positions of the parties, the Full Commission affirms in part and reverses in part the Opinion and Award of the deputy commissioner as modified herein.
 *********** Evidentiary Ruling — Rehabilitation Witness
Plaintiff filed a motion for leave to obtain evidence from a rehabilitation professional that was denied by the deputy commissioner. Plaintiff has renewed that motion before the Full Commission. Based on the Full Commission's finding on the merits of this case, it does not appear that rehabilitation evidence will be relevant or would potentially change the opinion of the Full Commission. Therefore, plaintiff's motion for leave to obtain evidence from a rehabilitation professional is denied.
 *********** Evidentiary Rulings — Defendant's Daubert Challenge; Plaintiff's Objection to Defendant's Daubert (Peer-Review) Witnesses
The defendants in this case have raised a challenge as to the competency of testimony from health care providers offered by the plaintiff. This challenge is predicated on the United States Supreme Court opinion in Daubert v. Merrell Dow Pharmaceuticals, Inc.,509 U.S. 579, 113 S.Ct. 2786 (1993), and its progeny, which generally hold that courts must act as gatekeepers of the evidence and exclude, or otherwise not consider, evidence which is not scientifically sound. Similarly, North Carolina jurisprudence has long held the proposition that "an expert is not competent to testify as to a causal relation which rests upon mere speculation or possibility." Young v. Hickory BusinessFurniture, 353 N.C. 227, 538 S.E.2d 912 (2000), citing Dean v. CarolinaCoach Co., 287 N.C. 515, 522, 215 S.E.2d 89, 94 (1975); Cummings v.Burroughs Wellcome Co., 130 N.C. App. 88. 91, 502 S.E.2d 26, 29, disc.rev. denied, 349 N.C. 355, 517 S.E.2d 890 (1998); Ballenger v. BurrisIndus., 66 N.C. App. 556, 567, 311 S.E.2d 881, 887, disc. rev. denied,310 N.C. 743, 315 S.E.2d 700 (1984). Consistent with this position, when examining the evidence in a workers' compensation claim, the Commission's review is not limited to the bald statements made by physicians and other expert witnesses; the Commission should determine whether the witness's opinion is based on sound, scientifically accepted fact or constitutes supposition, speculation, or mere possibility. The Commission should determine whether expert testimony is reliable and relevant (i.e., whether the evidence is competent) before weighing the evidence in determining the issues presented in the claim.
A clinical diagnosis unsupported by reliable and accepted methodology will not survive a Daubert challenge. See C. Burgin, Rule 702, Daubertand Medically Related Experts, TRIAL EVIDENCE at III-5 (North Carolina Bar Association 2000). Having a Medical Doctor degree does not necessarily qualify a witness to give an opinion on every conceivable medical question. Rather, the inquiry must go to the actual qualification of the expert as well as to the methodology used by the expert to reach his opinion. Upon receipt of a Daubert challenge, the deputy commissioner or Full Commission may evaluate whether the opinion of the expert has a sufficient factual basis to lift the opinion beyond conjecture, speculation, or mere possibility. The evidence necessary to support an expert's opinion may vary in each case depending upon the state of medical and scientific knowledge. Not all medical questions can be answered with certainty. In some cases, a "differential diagnosis," wherein the cause of a problem is determined by a process of scientific comparison and elimination, may be accepted as evidence when it is based on widely accepted, standard scientific method for determining the diagnosis and/or the etiology of the condition. See Westberry v.Gislaved Gummi AB, 178 F.3d 257 (4th Cir. 1999). Thus, under some circumstances, evidence of the temporal relationship of the incident to the symptoms may be relevant to determine the diagnosis or etiology, although the maxim "post hoc, ergo propter hoc" (after that, therefore because of that) is not acceptable evidence of causation. See Westberryv. Gislaved Gummi AB, 178 F.3d at 262-65 (the mere fact that two events correspond in time does not mean the two necessarily are related in any causative fashion; however, a temporal relationship between exposure to a substance and the onset of disease or a worsening of symptoms can provide evidence of causation), and Young v. Hickory Business Furniture,353 N.C. 227, 538 S.E.2d 912 ("post hoc, ergo propter hoc" is not competent evidence of causation).
In cases, such as this case, where there is conflicting medical opinion as to the nature and cause of plaintiff's complaints, it may be necessary for a party to present expert witnesses to testify concerning the acceptable scientific method for determining diagnosis and etiology, and, in some instances, to provide testimony to establish that another witness's opinion is not scientifically sound and should not be accepted as evidence. This evidence may be presented by witnesses who have not personally examined the plaintiff and may not have personal knowledge of the plaintiff's physical and/or mental condition, beyond what is reflected in the medical records. The testimony of a Daubert, or peer review, witness concerning the reasonable scientific method to diagnose an injury or its etiology and/or the lack of scientific foundation for the opinion of another offered witness will not be excluded on the basis that this witness has not personally examined the witness. A witness, however, who has not examined the patient cannot offer testimony about the plaintiff's injury, disease or condition which is beyond the records made available for review and accepted medical or scientific conclusions from these records. Health care providers extensively document their physical examinations, test results, diagnosis and treatment plans. Therefore, it is not unreasonable to allow other competent health care providers to review and explain the medical records and the accepted medical/scientific conclusions that can be made from the records.
Based on this analysis, plaintiff's objections to Robert H. Barth, Ph.D., and Victor Roth, M.D., predicated on the fact that the witnesses are non-examining practitioners, are denied. The testimony of these witnesses may be considered in determining the credibility and scientific methodology of other witnesses in this action so as to allow the Commission to understand the nature and etiology of the plaintiff's injury as found and described by her examining physicians and practitioners in her medical records.
Consistent with the foregoing discussion, and as further explained in the Findings of Facts, below, the Full Commission sustains the defendant's Daubert challenge to the testimony and medical records of Dr. Meggs, Dr. Schmechel, Dr. Stopford, and Dr. Guerra to the extent that they find that plaintiff has an unresolved, chronic physiological injury from the single exposure to nail polish remover in the course of her employment with Wal-Mart on March 26, 1992. First, the Full Commission finds that multiple chemical sensitivity (MCS) is not accepted by the majority of the competent medical community as a recognized diagnosis for an injury or disease. Although this is an accidental injury claim, rather than an occupational disease claim, in both instances the plaintiff in this case would be required to establish the diagnosis of an injury or disease that is related to and caused by the chemical exposure.[1] Multiple chemical sensitivity (MCS) is a term given by some practitioners to a collection of symptoms that some patients exhibit when allegedly exposed to chemicals and other substances that are believed to be irritating to the patient. A collection of symptoms, or a syndrome, is not necessarily an injury or a disease, and may not be a valid diagnosis recognized by the medical community. Further, the fact that a patient complains of symptoms and has raised these complaints after an incident does not necessarily establish that the patient has a particular condition or that the incident is medically, or scientifically, the cause of the condition or disease. Young v. HickoryBusiness Furniture, 353 N.C. 227, 538 S.E.2d 912 ("post hoc, ergo propter hoc" is not competent evidence of causation). Rather, the physician, through recognized scientific method, should differentiate between possible diagnoses based on relevant medical tests, examinations, objective and subjective complaints of the patient, and other information regularly used by health care professionals. See Westberry v. GislavedGummi AB, 178 F.3d at 262-65 (explaining permissible admission of evidence of differential diagnosis).
Based on the greater weight of the evidence, the Full Commission finds that a standard method of differentiating a diagnosis for an injury after a chemical exposure, whether in the form of an accidental injury or an occupational disease, as relevant to this case is to: (1) determine the nature of plaintiff's injury or disease[2] (which necessarily includes the performance of reasonable medical tests to confirm or negate potential diagnoses); (2) determine the chemicals or potential chemicals to which the patient was allegedly exposed and, to the extent possible, the dose and duration of the exposure; (3) determine the known injuries that can arise from exposure to the chemical(s); (4) compare the diagnosed condition with the type of injuries that are associated with the chemical exposure; and (5) evaluate whether there are other potential causes for plaintiff's injury and, if possible, attempt to negate the other potential causes. If the condition and exposure correlate, there is evidence that the exposure may be a cause of the injury. If there are other potential causes for plaintiff's condition, then the determination of the etiology will require a weighing of the evidence concerning each potential cause. If all known potential injuries from the exposure are excluded, there is no competent evidence to link the symptoms or condition to the exposure. Supposition and conjecture is not evidence of causation. Young v. Hickory Business Furniture, 353 N.C. 227,538 S.E.2d 912 (2000), citing Dean v. Carolina Coach Co., 287 N.C. 515,522, 215 S.E.2d 89, 94 (1975); Cummings v. Burroughs Wellcome Co.,130 N.C. App. 88. 91, 502 S.E.2d 26, 29, disc. rev. denied, 349 N.C. 355,517 S.E.2d 890 (1998); Ballenger v. Burris Indus., 66 N.C. App. 556,567, 311 S.E.2d 881, 887, disc. rev. denied, 310 N.C. 743, 315 S.E.2d 700
(1984); See also, Rutledge v. Tultex Corp., 308 N.C. 85, 301 S.E.2d 359
(1983) (causation must be established by reasonable probability, not mere possibility).
As further discussed in this opinion, the greater weight of the medical evidence establishes that plaintiff sustained a chemical exposure on March 26, 1992, while in the course and scope of her employment with Wal-Mart. The exposure was to nail polish remover which was identified to consist of acetone, methyl ethyl ketone (MEK), or other similar, mild solvent. "Chemical exposure" is the name for an event, in this case a potentially harmful event, and is not the diagnosis for an injury or disease. The MSDS (Material Safety Data Sheets) sheets for the nail polish remover, and other accepted scientific literature, recognize few lasting or chronic conditions from a one-time high level exposure to these solvents. In particular, the mild solvents in a single high concentration exposure have been known to cause RADS (reactive airway dysfunction syndrome), but evidence of RADS would be appear near the time of the event, if not immediately after the event. In this case, plaintiff had EKG, chest x-ray, urine tests, blood tests, spirometry, carbachol challenge, methocoline challenge, and other tests that would reveal lung damage, including RADS, and none of these tests produced evidence of damage or harm to the body from the March 1992 exposure. If plaintiff had RADS or some other respiratory condition secondary to the chemical exposure, these tests, taken within months of the exposure, would have indicated injury, which they did not. The objective findings from these tests negate the subjective complaints of plaintiff as it concerns the nature of her condition and the etiology of her symptoms. In addition, plaintiff's treating doctors were not able to find a physiologic cause for her subjective complaints and determined that her injury, if any, was psychological in nature. Despite plaintiff's continued complaints of differing symptoms, there is no competent evidence to establish that she sustained a chronic or lasting physical or physiological injury from the March 1992 exposure to nail polish remover.
Based on Daubert, Young, and their progeny of decisions, the Commission finds that the opinions of Dr. Meggs, Dr. Schmechel, Dr. Stopford, and Dr. Guerra to the effect that plaintiff has some lasting physiological injury from the single exposure to nail polish remover are not based on sound medical and scientific knowledge and are not competent evidence in this case. These opinions are at best a hypothesis of potential conditions and etiology based on speculation and conjecture unsupported by standard, accepted scientific or medical practice. Further, application of the principles of differential diagnosis, in particular in comparing the known responses from the mild solvents to plaintiff's condition, reveals that plaintiff does not a have an identifiable chronic or lasting physiologic injury from the chemical exposure. Furthermore, her subsequent complaints of allergies, allergic-related asthma, anemia, and anemia-related fatigue are not temporally or otherwise related to the chemical exposure. These expert witnesses also have failed to examine and exclude other non-occupational cause(s) for plaintiff's symptoms in attempting to differentiate the valid diagnosis and etiology of plaintiff's condition.
 *********** General Background and Burden of Proof
The issues on appeal in this action are generally framed into two categories: first, plaintiff's appeal seeking to find that there is a change in the plaintiff's condition sufficient to allow a continuation of benefits beyond the 300 week period set forth in N.C. Gen. Stat. §97-30; second, defendant's appeal seeking to suspend medical treatment because plaintiff's current symptoms are not casually related to her work injury, the exposure to nail polish remover in March 1992. Under the factual circumstances of this case, these issues raise unique procedural and substantive issues which are significant to the Commission's decision.
This action comes before the Full Commission on appeal from the second deputy commissioner's hearing and Opinion and Award in this action. After the first hearing, deputy commissioner Lorrie L. Dollar entered an Opinion and Award, filed January 16, 1996, which found that plaintiff sustained a compensable injury and ordered: (1) the payment of temporary total disability benefits from date of injury through August 16, 1992, when plaintiff returned to work at Wal-Mart; (2) temporary partial disability benefits from August 17, 1992, through April 6, 1994, at the rate of two-thirds of the difference between plaintiff's pre-injury and post-injury wage at Wal-Mart; (3) reasonable and necessary medical expenses for plaintiff's chemical exposure (not to include pre-existing and unrelated conditions); and (4) vocational counseling to enable plaintiff to return to gainful employment. In addition, the January 16, 1996, Opinion and Award specifically found that plaintiff had not met her burden to prove that she was entitled to continuing temporary partial benefits (particularly because her treating doctor, Dr. Guerra, had not taken her out of work), but also ordered that plaintiff comply with vocational counseling and ordered defendant to pay temporary total disability benefits during the period of vocational counseling until such time as plaintiff returned to work or until further order of the Commission.
Although no appeal was taken from the January 16, 1996 Opinion and Award, the Full Commission finds that it must review the evidence before the deputy commissioner at the time of the entry of the January 16, 1996, Opinion and Award, and define the "injury" found in that Award in order to address the questions of change of condition and reasonable medical treatment which are currently before the Commission on this appeal.
Based on the competent evidence, and in particular the competent medical evidence before Deputy Commissioner Dollar at the time the January 16, 1996, Award was entered, the Full Commission finds that plaintiff's injury was the psychological conditions of affective mood disorder and conversion disorder. At the time of the January 16, 1996, Opinion and Award there was no evidence of lasting or chronic physiologic injury to plaintiff. In addition, at this time there is no competent evidence of a lasting or chronic physiologic injury to plaintiff caused by the exposure to nail polish remover in March 1992.
Because the January 16, 1996, Opinion and Award expressly found that defendant was to "provide medical treatment which is necessary relative to the chemical exposure, but only insofar as those expenses are incurred as a result of the compensable injuries and not pre-existing or unrelated conditions" (Conclusion of Law No. 4) and this finding was not appealed by either party, the Full Commission finds that the burden of proof to establish that the medical care is not related to the compensable injury(ies) is on the defendant. See Parsons v. The Pantry, Inc.,126 N.C. App. 540, 485 S.E.2d 867 (1997). However, the burden of proof to establish change of condition is on plaintiff. N.C.G.S. § 97-42.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in a Pre-Trial Agreement, at the hearing and by post-hearing agreement as
 STIPULATIONS
1. At the time of the injury by accident, plaintiff's average weekly wage was $229.39, leading to a workers' compensation rate of $152.93 per week.
2. Plaintiff represents that after leaving her employment with defendant-employer, plaintiff worked part-time for Family Dollar Stores from October 30, 1996 through September 14, 1997.
3. Defendants have paid plaintiff the amount of $101.48 per week for partial disability since on or about July 7, 1997, pursuant to a Form 26 agreement of the parties. [The Form 26 was not approved by the Commission.]
4. The following documents kept in the regular course of business of the Industrial Commission are part of the record of this case:
 Form 19 received by the Commission on April 14, 1992;
 Form 21;
 Form 22;
 Pre-Trial Order and Hearing Stipulations dated June 13, 1994;
 Plaintiff s Exhibits 1-6 admitted at the June 13, 1994 hearing;
 Hearing testimony of witness Sherry Garland in I.C. File No. 224562;
 Hearing testimony of witness Ellen Hanson in I.C. File No. 228485;
 May 25, 1995 letter from Donnell Van Noppen III submitting additional medical records;
 All depositions submitted to the Industrial Commission following the June 13, 1994 hearing (These include transcripts of the depositions of Dr. Marc Guerra ; Dr. Donald E. Schmechel; Dr. Steven St. Clair; and Dianne Sanford);
 Opinion and Award of Deputy Commissioner Lorrie Dollar dated January 16, 1996;
 Form 26 signed by the parties and submitted to the Commission on September 10 and September 29, 1997;
 May 11, 1999 letter from plaintiff s counsel requesting increase in compensation on the basis of change of condition;
 Form 33 filed July 1, 1999;
 Form 33R filed September 20, 1999.
5. All medical records admitted into evidence during the prior proceedings before the Commission are part of the record of this case. These include the following, in addition to other medical records submitted with the pretrial order dated June 13, 1994:
 Iredell Memorial Hospital EMS, one page report;
 Iredell Memorial Hospital, seven pages;
 Drs. Pavelock and Voulgaropoulous, seven pages;
 Davis Community Hospital, five pages;
 Hickory Allergy Clinic, twenty-two pages;
 John May, M.D., thirteen pages;
 Frye Regional Medical Center, 101 pages.
6. The following medical and employment records submitted as part of this proceeding are part of the record of this case:
 Joint Exhibits 1-10 submitted at the hearing of this matter, and Joint Exhibits 11-15 submitted by Supplemental Stipulation on August 28, 2000.
7. The following issues are in dispute among the parties and thus remaining for decision by the Industrial Commission:
 a) Whether plaintiff is entitled to the payment of total disability benefits beginning September 15, 1997, and continuing until further order of the Industrial Commission;
 b) Whether defendants may discontinue paying partial disability compensation pursuant to G.S. § 97-30;
 c) Whether defendants are required to provide the treatment given to plaintiff by Dr. William J. Meggs, and by Dr. Michael H. Schlesinger of Piedmont Healthcare;
 d) Whether defendants are required to provide to plaintiff the special therapeutic vacuum cleaner prescribed for her by Dr. Joseph T. Inglefield, III;
 e) Whether defendants are required to continue providing prescription medications and palliative care prescribed for the plaintiff by her authorized treating physicians.
 ***********
Based upon all of the competent evidence of record, the undersigned makes the following additional:
 FINDINGS OF FACT
1. At the time of the second deputy commissioner's hearing, plaintiff was 49 years old. She is a high school graduate who had taken some college classes.
2. Before beginning her employment with defendant-employer, plaintiff managed a Pizza Hut restaurant for seven years, where she was responsible for all aspects of the restaurant's business. She had also worked in another restaurant venture and in an industrial production job. After she began working for defendant-employer, she was promoted through various positions, including customer service manager, department manager, and market manager. She transferred to defendant-employer's Statesville location and requested work on third shift so that she could attend classes.
3. On March 26, 1992, plaintiff and a number of other employees noticed an odor in the receiving area as they began to unload a truck. It was later determined that bottles of nail polish remover had been crushed, causing a spill. Plaintiff went into the trailer to unload it, at which time her eyes became dry, her nose burned, her throat became dry, and she felt as if she could not get any air. Plaintiff contends that she lost consciousness.
4. Plaintiff was taken by ambulance to Iredell Memorial Hospital emergency room where she was evaluated and released with instructions to take Tylenol and Benadryl as needed. The hospital records reveal that plaintiff had a chemical fume exposure that had resolved. Her lungs were clear. She was awake and alert. X-rays failed to identify any acute pulmonary abnormality. Plaintiff had a normal ECG. There was no evidence of serious physical injury to plaintiff.
5. Plaintiff was out of work from March 27, 1992, to August 17, 1992, and she was paid temporary total disability benefits during this time period. From August 1992 through April 1994, plaintiff continued to work at Wal-Mart on light duty, part-time work and with the plaintiff taking herself (without physician direction) out of work for periods of time. Defendants paid partial disability during those time periods. In the January 1996 Opinion and Award, Deputy Commissioner Dollar recommended and ordered plaintiff to submit to vocational rehabilitation counseling and ordered defendants to pay total temporary disability compensation during the period of vocational counseling. In October 1996, plaintiff sought and obtained employment with Family Dollar and continued in that employment until September 14, 1997, when she again took herself out of work. Plaintiff's wages at Family Dollar were less than her pre-injury average weekly wage and defendants paid temporary partial disability benefits while plaintiff was working at Family Dollar. Combined, plaintiff has received temporary total disability benefits and temporary partial disability compensation for more than 300 weeks from date of injury.
6. Soon after the 1992 chemical exposure, plaintiff was treated by Dr. Pavelock, who referred her for a neurological examination for seizure-like symptoms. Plaintiff did not have actual seizures and was diagnosed with the psychological conditions of either conversion reaction or pseudoseizures suggestive of malingering. Despite physical examinations and medical testing, no physiologic injury was found.
7. On April 22, 1992, plaintiff was seen by Steven St. Clair, M.D., a doctor board certified in the field of occupational medicine, with a master's degree in public health. Plaintiff complained of photophobia, headaches, concentration and memory problems, constipation, increased thirst, increased phlegm, and generalized fatigue. Dr. St. Clair found no physiological basis for plaintiff's symptoms and also opined the possibility of the psychological conditions of conversion disorder or factitious complaints.
8. Dr. St. Clair explained that the material safety data sheets (MSDS) and chemical analysis of the nail polish remover shows that it was primarily composed of widely used, weak solvents, either acetone or MEK (methyl ethyl ketone). These solvents were not considered to have a highly toxic long-term health effect. Based on accepted scientific literature, exposure on a short-term basis would produce short-term irritation type symptoms primarily in the mucus membranes of the upper respiratory system. If the concentration was extremely high, the solvents could cause central nervous system depression, including narcotic, anesthetic-type effect which could lead to respiratory arrest and death from the depression to the central nervous system, or otherwise would dissipate with no lasting effect. Plaintiff did not have such an exposure. A single exposure with a high concentration can also cause RADS (reactive airway dysfunction syndrome), where the airways leading to the lungs get sensitized leading to reactive dysfunction, similar to asthma.
9. Dr. St. Clair further explained that plaintiff's symptoms were subjective complaints without any corresponding physiological damage or harm to the body from the chemical exposure. Plaintiff complained of photophobia, but physical examination of her eyes was normal and there is no reported association between exposure to acetone/MEK and photophobia. Further, plaintiff had a normal neurological examination and normal pulmonary function as shown in the spirometry and carbachol challenge.
10. Dr. St. Clair explained that appropriate tests to determine whether plaintiff had sustained RADS included spirometry and carbachol challenge tests. The spirometry performed at Dr. St. Clair's request in April 1992 was normal and failed to indicate RADS. Similarly, the spirometry tests performed at Duke in June 1992 were also normal and included carbachol and isopropyl challenges. There was no dysfunction with the carbachol challenge and no improvement with the isopropyl challenge; thus, there was no evidence of RADS secondary to the chemical exposure.
11. Dr. St. Clair explained that solvents, such as the ones contained in the nail polish remover that the plaintiff was exposed, are commonly used in industry and that hundreds of thousands of workers have been exposed to concentrations of solvents which produce mild irritation type effects, but no long-term effects are associated with these exposures. If an injury were to occur following the exposure, there should be an immediate injury that later became chronic. Because plaintiff had normal lung function in the April and June 1992 spirometry tests, she would not be expected to later develop RADS from this exposure. These tests confirmed that plaintiff did not have respiratory injury secondary to the chemical exposure.
12. Although Dr. St. Clair expressed that plaintiff did not suffer a lasting physical, or physiological, injury from the chemical exposure, he did believe that plaintiff could have a psychiatric or psychological condition which was either a conversion reaction, factitious disorder (malingering), or a combination of these conditions. Dr. St. Clair stated that conversion reaction can occur after chemical exposures. A conversion reaction is when a patient has an abnormal physical reaction to a stimulus, but the reaction is caused psychologically rather than from injury or other physiologic factor.
13. Significant to an understanding of plaintiff's diagnosis and its relationship to the exposure to nail polish remover in March 1992 is the list of past and present conditions noted by plaintiff in her medical history form. In particular, plaintiff expressed that in the past she had had allergic reactions to medication or injections, bronchitis, hepatitis/jaundice/liver problems, kidney/bladder infections, anemia or blood problems, and hypoglycemia. Plaintiff also expressed epilepsy or seizures and fainting spells after the March 26, 1992 chemical exposure. Neurological examination, CT Scan, EEG examination, and other tests performed on plaintiff indicated that plaintiff's description of "seizure"-like symptoms were not physiologic in origin, but were either factitious seizures or symptomatic of a conversion disorder.
14. On May 18, 1992, Dr. St. Clair sent a letter to plaintiff explaining his findings. Dr. St. Clair explained that plaintiff was exposed to a mild solvent and that the symptoms that plaintiff presented "do not fit a pattern expected on the basis of any specific chemical or family of chemicals" to which she was exposed. He expressed that symptoms of short-term irritation to the eyes, nose, throat and lungs with headaches and skin rashes could be expected to last a short duration, up to one week. Long-term effects from these chemicals was not likely. Dr. St. Clair, however, suggested that the complaints may be the result of a psychological condition and recommended that plaintiff obtain a psychological evaluation, testing, and treatment.
15. The Full Commission finds that Dr. St. Clair's findings and opinions are based on accepted scientific method and valid, objective testing of plaintiff. No Daubert challenge was raised by plaintiff concerning his competency or the validity of his opinions. ApplyingDaubert analysis, the Full Commission finds Dr. St. Clair's opinion to be competent.
16. Beginning April 9, 1992, plaintiff came under the care of Dr. Marc Guerra, a family practitioner. Dr. Guerra referred plaintiff to Duke University Medical Center for an evaluation by an occupational medical specialist, Dr. Stopford, and by a neurologist Dr. Schmechel. Dr. Guerra also referred plaintiff to Piedmont Treatment Center for psychological counseling. Dr. Guerra's records for each visit include a physical examination of plaintiff's head, ears, eyes, note and throat (HEENT), which were normal.
17. Donald E. Schmechel, M.D., is a medical doctor at Duke University Medical Center and chief of neurology at Durham V.A. hospital. Dr. Schmechel is board certified in neurology and also was a pharmacology research associate at the National Institute of Health. Dr. Schmechel first saw plaintiff on June 17, 1992, at the referral of Dr. Guerra. Plaintiff presented with a history of headaches, photophobia, mood change with irritability and anxiety, fatigue, dizziness, poor sleep, temperamental outbursts, and problems in concentration. Dr. Schmechel performed a neurological examination which was essentially normal, with the exception of unsteadiness for gait and anxious mood and affect. The unsteady gait was probably due to an vitamin B-12 deficiency, which was unrelated to the chemical exposure, and subsequently improved with vitamin B-12 treatment. Blood tests indicated chemical changes including copper, zinc and ceruloplasmin which Dr. Schmechel believed were consistent with either depression or a post-toxic exposure. In November 1992, a brain evoke potential study was performed, which was normal. Dr. Schmechel concluded that plaintiff had a conversion reaction which would explain plaintiff's subjective complaints (symptoms) to which there was no physiological cause. A MMPI was performed which was abnormal revealing extreme emotional distress.
18. Dr. Schmechel opined that plaintiff had organic affect disorder with the organic component implying that the cause of the condition was secondary to the chemical exposure. As Dr. Schmechel explained in his second deposition, the "organic" component of this diagnosis was intended to imply that there was a physical injury to the nervous system. Dr. Schmechel admitted that he had no laboratory or other evidence to establish that plaintiff's psychological condition (the affect disorder) was caused by exposure to nail polish remover. Dr. Schmechel conceded that the solvents to which plaintiff was exposed are not known neurotoxins and there is no medical literature to report neurotoxic events or sequella following exposures to these substances.
19. At the time of his deposition in February 1995, Dr. Schmechel did not have benefit of review of plaintiff's prior medical records, was not aware of plaintiff's disclosure or prior history to Dr. St. Clair that she had allergic reactions to medication or injections, bronchitis, hepatitis/jaundice/liver problems, kidney/bladder infections, anemia or blood problems and hypoglycemia before the March 1992 exposure to nail polish remover. Also, in February 1995, Dr. Schmechel was not aware that plaintiff's problems with her gait may be due to a Vitamin B-12 deficiency and that this problem resolved with Vitamin B-12 treatment. Dr. Schmechel also could not exclude the possibility that plaintiff was modeling her behavior on information that she was receiving from health care providers, group counseling sessions, and others. Dr. Schmechel was not aware that plaintiff was seeking mental health counseling and was diagnosed for depression prior to the chemical exposure.
20. Dr. Schmechel was deposed for the second deputy commissioner's hearing on June 12, 2000. Dr. Schmechel again expressed that plaintiff had organic affective syndrome that was somewhat improved. The "organic" component of this diagnosis was intended to imply that there was a physical injury to the nervous system. "Affective" refers to key symptom area including sleep and emotions. Dr. Schmechel explained that this diagnosis did not imply or prove the etiology and did not indicate the severity of the condition. Further, Dr. Schmechel stated that plaintiff's condition was stable and had improved since he was deposed in 1995.
21. Dr. Schmechel indicated that since his last deposition plaintiff had problems with respiratory infection. Plaintiff had chronic inflammation which could be caused by asthma. Dr. Schmechel continued to express an opinion that plaintiff's condition was caused by the chemical exposure at Wal-Mart on March 26, 1992. This opinion was primarily based on plaintiff's history (after exposure, therefore caused by exposure) and fact that Dr. Schmechel has another patient from this same chemical exposure.
22. The Full Commission finds that Dr. Schmechel is a competent physician capable of diagnosing and treating plaintiff for the consequences of the chemical exposure as well as other neurological and neuro-psych conditions. In this capacity, the Full Commission accepts as credible the diagnosis, based on neuro-psych testing, that plaintiff suffers from an affective disorder and conversion reaction. The Full Commission, however, does not accept as competent the opinion of Dr. Schmechel that the plaintiff has sustained any lasting or chronic physiological injury (including to her nervous system) from the chemical exposure in March 1992. First, Dr. Schmechel admits that plaintiff was exposed to mild solvents which are not known to cause physical symptoms such as presented by plaintiff. Second, Dr. Schmechel admits that there is a lot of controversy in the medical community concerning the diagnosis of multiple chemical sensitivity. Third, he has not considered or negated other potential causes for her condition, including her pre-existing depression and allergies, non-occupational asthma, anemia and vitamin deficiency. Because Dr. Schmechel has not proceeded in the normal and standard medical process of differential diagnosis to identify and negate potential causes for plaintiff's condition, his opinions that plaintiff sustained an injury to her nervous system constitute, at best, conjecture and mere speculation, some of which are not based on accepted medical practice. Therefore, the Full Commission gives little weight to Dr. Schmechel's opinions concerning causation.
23. Joseph T. Ingerfield, III, M.D., a physician board certified in pediatrics and in allergy and immunology started to treat plaintiff in September 1993 upon referral by Dr. Guerra. Plaintiff initially presented with respiratory complaints of difficulty with breathing and problems with sense of smell which plaintiff associated with her exposure at Wal-Mart in March 1992. After numerous examinations and testing, Dr. Ingerfield reached the diagnosis of allergic rhinitis (hay fever), uticaria (hives), chronic sinusitis, and a variant form of asthma consisting predominantly of coughing. Plaintiff also has a deviated septum (which is either congenital or from physical trauma and not related to the chemical exposure) which plays a role in her headaches, sinus infections, and need for medications and antibiotics to treat her allergies and sinus infections. Concerning the potential cause for plaintiff's condition, Dr. Ingerfield found that plaintiff had a normal pulmonary function test (with only a slightly low peak flow) and that allergy skin testing found that plaintiff had positive reaction to ragweed, dust mite, cockroach, dog, horse, tobacco, some molds, and tomato. Plaintiff's symptoms varied seasonally. Further, plaintiff has a type of asthma that may be triggered by allergies. Dr. Ingerfield stated that it would be hard to prove that exposure to chemicals at Wal-Mart could be the mechanism to cause plaintiff's allergies and asthma. Allergies come after a change, but it is difficult to determine the exact etiology.
24. Dr. Ingerfield is not certain as to the cause of plaintiff's allergies and allergy related asthma. He testified that he does not know plaintiff's past history for allergies. Further, he also stated that there can be an emotional trigger for allergies and that depression can aggravate allergy problems. Dr. Ingerfield was not aware of any literature that would link plaintiff's allergies to the chemical exposure. In contrast, Dr. Ingerfield explained that allergies are a matter of predisposition and exposure. Allergies from chemical exposures generally arise from constant exposure to chemicals such as with painters who are exposed to paint and paint thinner fumes and not from a single exposure. Dr. Ingerfield expressed that his reports started to use stronger language suggesting a relationship between the exposure and plaintiff's allergies and asthma because plaintiff continues to have problems, not because he has any medical or scientific information to establish a relationship.
25. Coincidental to Dr. Ingerfield's allergy testing which reported that plaintiff was allergic to dogs, plaintiff testified that after the chemical exposure her son brought home a dog that now lives with them. Plaintiff expressed that this was not significant because her allergy medications keep this problem under control. Dr. Ingerfield's testing and plaintiff's testimony, however, reveals that plaintiff is allergic to dogs, after the exposure plaintiff was living with a dog, and the dog appears to be, at least in part, a cause for plaintiff's allergy problems and resulting allergy related asthma.
26. Plaintiff had indicated to Dr. St. Clair that she had allergies and bronchitis prior to the March 1992 exposure, that plaintiff was diagnosed with depression prior to the exposure, that plaintiff was having emotional problems with her children and marriage, and that plaintiff is allergic to dogs and started to live with a dog after the exposure, each of which could explain an increase in her allergy symptoms and the resulting allergy induced asthma.
27. Plaintiff saw Michael H. Schlesinger, M.D., a urologist, in January 1998 for urinary incontinence. Plaintiff gave a history of intermittent urinary incontinence after chemical exposure in 1992. Dr. Schlesinger performed a cystometrogram and did not observe any evidence of incontinence. Based on plaintiff's description of her incontinence, Dr. Schlesinger opined that she probably had urge-related incontinence and prescribed some medications. This opinion was supported by plaintiff's statements that her incontinence improved with use of the medications. Dr. Schlesinger assumed that plaintiff's symptoms were probably coming from some neurological problems, perhaps secondary to the chemical exposure. Her final diagnosis was hypertonic bladder. Because this condition can be idiopathic, Dr. Schlesinger could not state that the problem was related to the chemical exposure at work in 1992. In fact, Dr. Schlesinger could not confirm the incontinence because it was not reproduced on examination and was not otherwise observed.
28. Plaintiff started counseling with Piedmont Treatment Center in August 1992. Her primary counselor was Dianne Sanford who has a masters degree in education and community mental health, is certified as a counselor, and was in the process of becoming a licensed counselor in North Carolina. Ms. Sanford worked under the direction of Dr. Schmidt and because she was not a physician she deferred to the physicians concerning plaintiff's diagnosis. Ms. Sanford explained that plaintiff was diagnosed with an adjustment disorder with mixed emotional features and organic mood disorder secondary to chemical exposure. Ms. Sanford had not worked with many patients with conversion reaction and thereby could not comment on whether plaintiff's complaints were a conversion reaction.
29. Ms. Sanford primarily worked as plaintiff's counselor and psychotherapist and attempted to assist her with her life problems which, in addition to the chemical exposure, included an abusive first marriage and family adjustments with her current husband and children. The counseling sessions often included discussions concerning plaintiff's childhood, relationship with her parents, and issues with her adult children and her current husband. Significant in these issues included the fact that plaintiff's adult children wanted to move out of her house and live with their father, her ex-husband, her daughter's unwed pregnancy, and her son's bout with the law and subsequent imprisonment. Ms. Sanford explained that in order to work with the "here and now," it is often necessary to go back into other, sometimes past, problems.
30. Ms. Sanford explained that she had obtained medical records concerning plaintiff from prior health care providers for mental health treatment. In 1987, plaintiff treated with Dr. Patricia Hill, a psychiatrist in Statesville, for depression arising from problems with plaintiff's children. Dr. Hill gave a diagnosis of compulsive traits with adjustment difficulties versus depression and advised psychotherapy and antidepressants. Ms. Sanford agreed with Dr. Hill's assessment that plaintiff had an adjustment disorder.
31. Ms. Sanford had also acquired records from Margaret Spence at Tri-County Mental Health Center. These records indicated that plaintiff had started mental health treatment at their facility on March 5, 1992 (before the chemical exposure at Wal-Mart) for depression arising from plaintiff's family situation. On April 14, 1992 (after the chemical exposure at Wal-Mart), plaintiff returned to Tri-County Mental Health Center. The note for the April visit indicated that plaintiff was less depressed and more in control of her life. There was no mention of the chemical exposure at Wal-Mart. On April 13, 1992, plaintiff saw Jeffrey Kaiser, M.D., who noted that plaintiff had a long history of depression on and off through her life. Again, there was no mention of a chemical exposure or injury or harm from a chemical exposure. On May 1, 1992, plaintiff was noted to be having stress from not being able to understand her doctors, but there was no indication of stress or other mental consequence from the actual chemical spill. The note for the May 22, 1992, visit indicated that plaintiff was stressed because an eleven year old drunk driver ran into her house and they were unable to live in their house, her daughter spent three days in jail, and for the first time there was mention of health problems from the chemical spill at Wal-Mart. Other appointments at Tri-County Mental Health Center failed to mention the Wal-Mart incident.
32. Ms. Sanford agreed that plaintiff had adjustment disorders and depression before the Wal-Mart incident and she could not state that plaintiff would not have required her treatment to cope with her children if the Wal-Mart incident had not occurred.
33. The Full Commission finds the testimony of Dianne Sanford to be beneficial in understanding the nature of plaintiff's mental health problems prior to the chemical exposure at Wal-Mart and the counseling provided by Ms. Sanford. Ms. Sanford did not diagnose plaintiff's condition, deferred to the physicians in this capacity, and was not aware of the results of neuropsychological testing performed at Duke. The later fact may be significant in understanding why plaintiff may not have improved, particularly post counseling. First, Ms. Sanford was not familiar with conversion reactions and did not have experience in treating these patients. Ms. Sanford assumed that plaintiff had actual, chronic physical injury resulting from the chemical exposure and appears through individual and group counseling to support plaintiff's hysteric symptoms, rather than helping plaintiff to understand that her symptoms were psychological rather than physical. Ms. Sanford's care was not closely coordinated with Dr. Guerra's office and she did not have contact with the physicians at Duke. This circumstance caused an iatrogenic response: it caused plaintiff to believe that she was physically injured as a result of the chemical exposure and most likely caused plaintiff to anticipate that she should have a physical reaction from the chemical exposure. Rather than addressing plaintiff's conversion reaction, Ms. Sanford's counseling reinforced plaintiff's mistaken belief that her symptoms were real and related to the chemical exposure. Ms. Sanford expressed that she often attempted to contact Dr. Guerra but had difficulty coordinating their schedules. Ms. Sanford is not a physician and claimed no expertise in determining the etiology of plaintiff's condition and thereby the Full Commission does not accept her as an authority as to the diagnosis and cause for plaintiff's condition.
34. Dr. Marc F. Guerra assumed the role of coordinating the treatment for plaintiff's complaints. Dr. Guerra explained that patients with chemical exposures are difficult to assess because they often have a multitude of physical complaints and physical problems, and, therefore, he considers himself to be the coordinator of the evaluation of the injuries and the rehabilitation of these patients. Dr. Guerra referred plaintiff to Duke University Medical Center, including Dr. Schmechel for neuro-psych testing and Dr. Stopford for occupational medicine consultation, Piedmont Treatment Center for counseling, Dr. Inglefield for allergy evaluation and treatment, and Dr. Schlesinger for urological examination and treatment for incontinence.
35. Dr. Guerra had great concern regarding the extent of plaintiff's injury upon initial examination. He referred her to Duke for occupational and neurologic evaluation to determine whether she has any physical injury. Plaintiff was not reliable on physical examination and Dr. Guerra suspected hysteria with psychological overlay.
36. Plaintiff appeared to be forcing coughs and had other unexplained, inappropriate behavior. Dr. Guerra believed that he had heard wheezing upon exercise, but the spirometry testing at Duke, together with the carbachol testing failed to show any pulmonary function impairment. Dr. Guerra could not express whether the wheezing, or bronchitis, that he heard in September 1992 was related to the chemical exposure. Based on his examinations and the information received from Dr. Stopford and Dr. Schmechel at Duke, Dr. Guerra was not able to find any physiologic explanation for plaintiff's condition. As previously noted, Dr. Guerra's examination of plaintiff's head, ears, eyes, nose and throat (HEENT) were consistently normal. Dr. Guerra believed that plaintiff's injury was psychological.
37. Dr. Guerra stated that he kept plaintiff off from work until September 1992 because he was deferring to Ms. Sanford and Piedmont Treatment Center regarding her ability to work. She was not kept off from work because of any physical abnormality. Dr. Guerra suspected that plaintiff was afraid to go back to work and that she had some mental-psychological barrier to returning to work at Wal-Mart. Even after plaintiff was released to return to work, she took herself out of work, rather than leaving work or not working at a doctor's direction. Dr. Guerra expressed that plaintiff was leaving work because of panic attacks triggered by odors at work. Dr. Guerra explained that a patient with underlying asthma could experience psychological stressors, such has odors, which can trigger their asthma. Dr. Guerra never saw any of plaintiff's alleged "attacks," but he explained that there was no physiologic explanation for the attacks and the attacks probably represented a conversion reaction.
38. Although Dr. Guerra appears to have believed that plaintiff's symptoms were psychological, rather than physical, it does not appear that he conveyed this information to the counselors at Piedmont Treatment Center.
39. Dr. Guerra was deposed on August 1, 2000, for the second deputy commissioner's hearing, and his testimony appears to have changed in several ways. Dr. Guerra now believes that plaintiff has a physical injury from the chemical exposure in 1992. Although Dr. Guerra continues to believe that plaintiff suffers from conversion reaction (the conversion of stress into physical findings), he now believes that she has multiple chemical sensitivity and RADS. Dr. Guerra also noted that plaintiff has allergies and that plaintiff has anemia or chronic anemia. Dr. Guerra does not believe that plaintiff has post traumatic stress disorder (PTSD). Dr. Guerra bases his current opinions of physical injury on the opinions of Dr. Meggs and believes that plaintiff has RADS because Dr. Meggs made that diagnosis. Dr. Guerra did concede that multiple chemical sensitivities is an area that is full of controversy and is not accepted by all health care providers, but he accepted without question Dr. Meggs' authority on the issue.
40. Dr. Guerra believes that plaintiff cannot work after the Family Dollar position because of fatigue, shortness of breath, and hypersensitivity to odors. Dr. Guerra believes that plaintiff needs long-term counseling and will need long-term continuing care. When pressed on the issue of employment, Dr. Guerra states that plaintiff can work and that she should try to work, but it is likely that she may fail due to her symptoms.
41. Plaintiff saw William J. Meggs, M.D., on April 18, 1997. Dr. Meggs is board certified in medical toxicology, allergy and clinical immunology, emergency medicine, and internal medicine. Dr. Meggs is a professor in the department of emergency medicine at East Carolina University and chief of their division of toxicology. Dr. Meggs advertises in an newsletter soliciting patients that he is an expert in chemical sensitivity. Dr. Meggs has published a study distinguishing the appearance of inflammation in cases of chemical irritant rhinitis from the appearance of inflammation in cases of allergic irritant rhinitis. He examined plaintiff with a fiberoptic rhinolaryngoscope and found the changes in the mucous, cobblestoning, and swelling which he has found in other chemical irritant cases and thereby concluded that plaintiff has a physical injury from the chemical exposure at Wal-Mart in 1992. Dr. Meggs' diagnosis is chronic chemical irritant rhinitis and chemical irritant asthma. Dr. Meggs opined that plaintiff was 100% disabled and gave this opinion while she was employed at Family Dollar and before plaintiff left her employment. Dr. Meggs' opinion concerning disability is based on his history with these patients. He ultimately conceded that whether an employee can actually work is determined on a trial and error basis.
42. Dr. Meggs explained that he frequently sees and treats patients with multiple chemical sensitivity (MCS), although he claims that he tries to define objective evidence of disease and then look at the chemicals that they have been exposed to and determine whether they cause the disease. Dr. Meggs based his diagnosis of "chemical irritant" rather than "allergic irritant" rhinitis and asthma on the history received from patient, his belief that plaintiff did not have allergies or asthma before the chemical exposure, and his rhinolaryngoscopic examination. Dr. Meggs conceded that he was not aware of any way to clinically differentiate allergic asthma from chemical irritant asthma and that his rhinoscopic findings do not rule out allergic rhinitis.
43. Although Dr. Meggs recognized that accepted medical practice for differential diagnosis includes objectively defining the disease, looking at the chemicals to which the patient was exposed, and comparing whether the chemicals can cause the disease, he did not follow this procedure in determining the cause of plaintiff's condition in this case. Dr. Meggs was not aware that plaintiff had depression, allergies and bronchitis before the 1992 chemical exposure. Dr. Meggs has not considered or negated other potential causes for her condition, including her pre-existing depression, allergies, bronchitis, non-occupational asthma, anemia and vitamin deficiency. Further, Dr. Meggs' opinion based on his published work concerning his rhinoscope findings in chemical exposure patients is not scientifically sound because the number of patients in the study are few, the study did not negate alleged chemical exposure patients that also have allergies, and the scientific conclusion from his report was actually that more study should be done, not that a physician can actually differentiate between chemical and allergic rhinitis. Because Dr. Meggs has not proceeded in the normal and standard medical process of differential diagnosis to identify and negate potential causes for plaintiff's condition, his opinions concerning etiology constitute, at best, conjecture and speculation, some of which are not accepted by the accepted medical community. For these and other reasons stated herein, the Full Commission gives little weight to Dr. Meggs opinions concerning diagnosis and causation.
44. Defendant presented three non-examining Daubert witnesses for the second deputy commissioner's hearing. Victor Roth, M.D., is board certified in family practice and occupational medicine and also has a master's degree in public health. He is a clinical assistant professor at the University of Michigan. Dr. Roth was presented with medical records concerning the diagnosis and treatment of plaintiff in order to evaluate whether the symptoms that she was experiencing in 1999 and 2000 were related to, and thereby compensable under, her 1992 chemical exposure at Wal-Mart. Consistent with the testimony previously offered by Dr. St. Clair, Dr. Roth explained that the nail polish remover consisted of mild solvents, principally acetone or similar solvents, which have a low degree of toxicity and a fast half life of 3 hours (meaning that within 3 hours half of the substance has left the body).
45. With reference with the offered diagnosis of RADS, Dr. Roth explained that plaintiff does not have RADS from the chemical exposure: first, the emergency room records on the date of injury report that plaintiff's lungs are clear, she did not have respiratory distress, and there was no indication of eye or throat irritation; second, on April 3, 1992, she had a baseline pulmonary function test which showed no change in her FEV-1 which is one of the significant indicators for asthma; third, on April 22, 1992, she had another pulmonary function test that was normal and examination revealed her lungs were clear; and, fourth, on June 16, 1992, plaintiff had a carbachol challenge test that was negative with no evidence of bronchodilator airway disease. Each of these tests negate the diagnosis of RADS secondary to the March 1992 exposure to nail polish remover. These tests negate the temporal relationship necessary to link RADS to the exposure, because chemically induced RADS would be found at or near the time of the exposure and become chronic; RADS does not progress slowly.
46. Dr. Roth testified that the rhinoscopic examination performed by Dr. Meggs is not an accepted diagnostic tool for chemically induced injury. First, the fiberoptic rhinoscopic findings of pale mucosa with prominent vessels, marked edema, and cobblestoning is not diagnostic for asthma. These findings are fairly common with allergies and are not unique to chemical exposures.
47. Dr. Roth took extreme exception to Dr. Meggs' and other doctors' conclusions of causation and the use of multiple chemical sensitivity to define plaintiff's condition. Dr. Roth explained that multiple chemical sensitivity (MCS) is not an accepted medical diagnosis for an injury or disease. In 1996 the World Health Organization (WHO) issued a report expressing that MCS cannot be recognized as a clinically defined disease because the relationship between symptoms and exposure has not been proven. Consistent with this position, MCS is not accepted as a valid diagnosis in the established medical community. Dr. Roth was disturbed that Dr. Meggs and other health care providers jumped to the conclusion that plaintiff had a chemically induced physical injury from the March 1992 exposure to nail polish remover without following proper scientific method. In particular, Dr. Roth noted that standard allergy skin tests revealed that plaintiff had pre-existing allergies, yet Dr. Meggs jumped to the conclusion that plaintiff had chemically related disease without considering these allergies. Dr. Roth reviewed Dr. Meggs' published studies and concluded that they were not scientifically sound and sufficient to support the conclusions offered in this case. Like in this case, Dr. Meggs' publication concluded that the study patients had chemically induced disease whereas his publication revealed that some of the patients had other allergies, and Dr. Meggs ignored and failed to negate the significance of the allergies. Further, Dr. Roth explained that Dr. Meggs' article concerning the chlorine dioxide exposure is not authoritative in this case because chlorine dioxide is a significant irritant, not like the acetone or MEK that the plaintiff may have been exposed to in this case. And, additionally the reported rhinoscope findings in these patients does not prove that they had chemically induced irritation because the study group was small, 13 cases, and some of the patients had other allergies that were ignored. Dr. Roth indicated that plaintiff's positive rhinoscope study by Dr. Meggs was not significant in formulating a diagnosis in plaintiff because Dr. Meggs' methods are not scientifically proven or accepted. Plaintiff's symptoms of rhinitis are consistent with her seasonal and other allergies.
48. Based on the medical records, Dr. Roth concurred with Dr. Schmechel, Dr. St. Clair, and Dr. Guerra's initial opinions that plaintiff did not sustain a lasting physical injury from the chemical exposure at Wal-Mart. Her condition is a psychogenic illness which causes her to believe that something is bad when she is exposed to an odor or other stimulus. Dr. Roth agrees with Dr. Schmechel's November 1992 report where it indicates that plaintiff had normal neurological examination, but exhibited indications of conversion disorder.
49. Dr. Roth testified that he did not believe that current treatment by Dr. Guerra and Dr. Schmechel are related to the 1992 chemical exposure. Dr. Guerra's current diagnosis is allergic rhinitis. There is no evidence that this condition is related to the chemical exposure. In particular, the ER records showed that plaintiff had clear lungs, plaintiff was laughing and talking with the hospital staff, subsequently she had normal neurological examinations and tests and negative pulmonary testing, and now months (or years) later the doctors are making and relating the diagnosis that are not supported by the objective tests. Dr. Roth expressed that plaintiff has received erroneous medical advice from her health care providers concerning her diagnosis.
50. Dr. Roth is of the opinion that plaintiff has a psychological condition for which she needs extensive psychiatric treatment. Dr. Roth is concerned that plaintiff's problem is a conversion disorder or other psychiatric condition.
51. Dr. Roth concludes that plaintiff is not physiologically disabled or precluded from employment because of the 1992 exposure. She is not disabled based on chemically induced RADS because the testing shows she does not have this condition. She is not disabled based on MCS because there is no such diagnosis. She is not disabled because of breathing problems from the 1992 exposure, because the testing did not reveal this type of injury after the exposure. Further, the fact that plaintiff is on asthma medication does not mean that she has asthma from this exposure. Dr. Roth does not know whether plaintiff's psychiatric condition is disabling.
52. Robert H. Barth, Ph.D., was offered as a Daubert witness concerning plaintiff's psychological condition. Dr. Barth is a clinical psychologist with a Ph.D. in clinical psychology and a post-doctorial fellowship from Harvard Medical School. Dr. Barth performed a peer review of plaintiff's treatment by reviewing her medical records.
53. Dr. Barth agreed with Dr. Roth, and other witnesses, that MCS is not a valid, accepted diagnosis for a disease although it routinely appears in plaintiff's medical records. MCS is not an accepted diagnosis in the medical community. Most research on what has been called MCS reveals that the patient has a somatoform disorder which is a mental illness that presents with physical symptoms.
54. Dr. Barth explained that plaintiff's symptoms, as presented in her records, fit nicely with the diagnosed disorder that is scientifically validated and accepted as a somatoform disorder. Consistent with this diagnosis is panic disorder which is a condition that is associated with catastrophic reaction to mild stimulus. Dr. Barth stated that the somatoform disorder is not related to the 1992 chemical exposure. A somatoform disorder is where a patient has physical complaints that cannot be fully explained by a known medical condition.
55. Dr. Barth concluded that plaintiff has a non-work related somatoform disorder, a non-work related panic disorder, and non-work related personality disorder, consistent with malingering. The legible counseling, and other records, indicate that the stressors for her condition are primarily non-work related stressors. There is no scientific evidence to show that exposure to chemicals causes somatoform disorder. There is no evidence from the medical records that the plaintiff's psychological condition is disabling and preventing her from working.
56. Defendant's also represented Douglas Adams, M.D., as a Daubert
witness. Dr. Adams is board certified in family practice and occupational medicine and has a masters degree in public health. He also performed a peer review of plaintiff's treatment by reviewing her medical records. Similar to other witnesses, Dr. Adams explained that acetone is not a significant irritant and that there is no long term toxic effect. In contrast, acetone has been dropped from the list of toxic chemicals on the basis that it is one of the most commonly studied solvents. MEK is slightly more toxic than acetone and can cause acute irritation and an anesthesia-like high, but also is not a recognized hazardous substance.
57. Dr. Adams agreed with Dr. St. Clair, Dr. Roth, and others that plaintiff did not exhibit signs of RADS as a consequence of the 1992 exposure. The objective testing performed on plaintiff was negative for RADS from this exposure.
58. Further, Dr. Adams agreed that MCS is not an accepted medical diagnosis because the relationship to exposures and symptoms has not scientifically been proven.
59. Dr. Adams testified that based on plaintiff's medical records, examinations, and tests, plaintiff's symptoms have not been related to the 1992 chemical exposure to nail polish remover.
60. Dr. Adams agrees that plaintiff has an affective disorder, but disagrees that it is an organic affective disorder. Affective disorder is a mood disorder that generally takes the form of bipolar illness, such as manic depression, or as depression alone. "Organic" would refer to after chemical exposure, but there are no medical studies to support that exposure to solvents would cause this condition.
61. Plaintiff offered Darren Duane Stutz as a lay witness to confirm her medical condition. Mr. Stutz indicated that he met plaintiff when she worked at Pizza Hut and that he had vacationed with plaintiff both before and after her injury at Wal-Mart. In addition to the obvious description of plaintiff's allergy related symptoms, Mr. Stutz expressed that plaintiff had gained in excess of a 100 pounds since he has known her, that she was emotionally troubled by her daughter moving away and her son's desire to move away and trouble with the law. Significant to the issues before the Commission, Mr. Stutz indicated that plaintiff's condition had improved in the last year and half or two years.
62. After the plaintiff had exhausted her 300 week period for partial incapacity benefits, she filed a motion to modify the 1996 Award in an effort to obtain further disability benefits. This filing raises the issues of whether plaintiff is entitled to total disability benefits beginning on September 15, 1997, and continuing, and whether defendants can discontinue paying partial disability compensation pursuant to the 300 week period of N.C. Gen. Stat. § 97-30.
63. The evidence is undisputed that plaintiff accepted vocational rehabilitation counseling as ordered by the January 16, 1996, Opinion and Award, and that this counseling resulted in her employment with Family Dollar. Plaintiff was hired by Family Dollar together with approximately 20 other employees as temporary employees in conjunction with the opening of a new store location. Plaintiff was one of eight employees that Family Dollar choose to keep after the store opened. Plaintiff worked at Family Dollar until September 14, 1997, when she took herself off from work.
64. Plaintiff presented Lori Ezell, her supervisor from Family Dollar, to establish that plaintiff could not perform the work at Family Dollar, that this position was not suitable, and that plaintiff is disabled. Ms. Ezell appears to have developed a friendship with plaintiff and her desire to help the plaintiff is evident from her testimony. Although Ms. Ezell did testify to plaintiff having reactions to chemicals, symptoms that appear to be consistent with conversion reaction, the objective evidence is that plaintiff was able to obtain and keep employment with Family Dollar. First, plaintiff was one of eight temporary employees that Family Dollar choose to keep as a permanent employee; second, plaintiff was able to maintain her employment for almost a year when plaintiff choose to leave — she was not terminated by Family Dollar; and perhaps more significantly, Ms. Ezell believed that plaintiff was a good worker and was "management material." The greater weight of the medical evidence is that plaintiff can work in some capacity and that the best test and measure of her ability to earn wages will be her actual ability to find and keep work. Plaintiff's employment at Family Dollar is evidence that plaintiff was able to find and maintain work. Plaintiff is not totally disabled.
65. Based on the greater weight of the medical and psychological evidence, plaintiff has failed to prove that she has sustained a material change in her condition that is related to her 1992 injury and/or that she is totally disabled as a result of the injuries and psychological condition caused and/or aggravated by the March 1992 exposure to nail polish remover. As found herein, plaintiff does not have a lasting physical injury from the chemical exposure, and does not have a compensable physical injury that precludes her employment or otherwise causes disability. Further, the 1996 Opinion and Order correctly finds that plaintiff did not establish that she was totally disabled at that time. Plaintiff has not offered any new evidence from plaintiff's counselor, psychologist, or other mental health provider to establish that her mental or psychological condition has changed since the 1996 Award. In contrast, the medical and lay evidence is that plaintiff's condition has improved. In particular, Dr. Schmechel testified that plaintiff's condition was stable and that she has improved since he was deposed in 1995, and Mr. Stutz testified that plaintiff has improved in the last year and a half. Therefore, based on the greater weight of the evidence, the Full Commission finds that plaintiff has failed to establish a change in medical condition and has failed to establish that plaintiff is totally disabled from employment as a result of the injuries received in the 1992 chemical exposure. At best, plaintiff may have some partial disability; however, the 300 week period has expired and defendants owe no further benefits for a partial disability.
66. Based on the greater weight of the competent medical and psychological evidence, plaintiff sustained an acute irritation to her upper respiratory system from the exposure to nail polish remover on March 26, 1992. This condition resolved shortly after the exposure. Plaintiff has no lasting or chronic physical condition from the exposure to nail polish remover. The nail polish remover consists of mild solvents which are not associated with lasting physical injury. In some instances a single, high concentration to the nail polish remover could cause central nervous system compromise, primarily consisting of an anesthesia effect that would affect the respiratory system and could cause respiratory arrest and death. Plaintiff had normal vital signs in the emergency room; thus, her medical records do not support this condition. Further, once the anesthesia effect wears off, it does not recur. A single, high concentration to the solvents in the nail polish remover in rare instances is also associated with RADS. Plaintiff, however, had extensive testing for pulmonary disease shortly after the exposure and these tests failed to establish evidence of RADS or other respiratory compromise. Thus, there is no evidence that this condition in plaintiff within the temporal time period to associate the condition to the chemical exposure. The medical testimony is that the mild solvents to which plaintiff was exposed are commonly used in occupational settings, numerous employees are exposed to these solvents, and most have no lasting effects. Plaintiff appears to fall into this category and does not have evidence of a physiologic injury resulting from the exposure. Because plaintiff does not currently have a physical injury related to the 1992 chemical exposure, she does not require medical care by Dr. Guerra, Dr. Stopford, Dr. Schmechel, Dr. Meggs, Dr. Inglefield, or others for any physical condition alleged to be associated with the March 1992 chemical exposure. Any medical care by these or other physicians for physical conditions may be reasonable for treatment of plaintiff's allergies, allergy induced asthma, anemia, and other conditions which are not compensable under this workers' compensation claim.
67. Although plaintiff has no lasting physical injury, the greater weight of the evidence is that she sustained a psychological injury as a result of the 1992 chemical exposure. Although plaintiff was previously depressed and appears to have had a long history of mental illness, the greater weight of the medical evidence is that the experience of the chemical exposure either caused or aggravated her affective disorder (depression) and produced a conversion reaction. The greater weight of the medical evidence does not establish that the chemical exposure was the sole cause of these conditions; however, plaintiff's perception of danger from the chemical exposure appears to be a significant factor in her mental illness after the exposure.
68. In contrast to the alleged physical injury, the greater weight of the evidence is that plaintiff may continue to need care for the affect disorder and conversion reaction that were caused or aggravated by the 1992 chemical exposure. Unfortunately, it appears that plaintiff's lack of significant progress with this condition may be iatrogenic in that the counselor, Ms. Sanford, was not familiar with conversion reaction and was not advised that the medical doctors had found that plaintiff did not have a physical injury. The psychological care provided to date does not appear to address adequately the true nature of plaintiff's illness and thereby has not been effective in the cure or relief of plaintiff from her condition. It appears that plaintiff would benefit from a behavioral specialist who is familiar with conversion reaction and may be able to assist her with cognitive or other therapy to differentiate hazardous stimulus from the ordinary odors of life. The Full Commission strongly suggests that the parties confer and attempt to locate and agree on an appropriate mental health plan with providers that are familiar with her condition. Consistent with the January 16, 1996, Opinion and Award, defendant is responsible for the treatment for the affect disorder and conversion reaction which are related to the 1992 chemical exposure, but are not responsible for treatment for injuries and conditions that were pre-existing or otherwise not related.
69. Defendants have paid plaintiff temporary partial disability compensation from 7 July 1997 through the date of the second deputy commissioner's Opinion and Award, a period of at least164 weeks.
70. Pursuant to the 1996 Opinion and Award filed in this claim, defendants paid plaintiff temporary total disability compensation from March 27, 1992 through August 16, 1992, a period of 20.4286 week. Plaintiff received temporary partial disability compensation from 17 August 1992 through 6 April 1994, a period of 85.4286 weeks. The 1996 Opinion and Award also ordered defendants to pay plaintiff temporary total disability compensation beginning on the date of the decision, January 16, 1996, and continuing until she returned to work or until Order of the Industrial Commission.
71. After January 16, 1996, plaintiff first returned to work on 30 October 1996, a period of 41.1429 weeks. Thus, defendant paid plaintiff temporary total disability compensation for an additional period of 41.1429 weeks.
72. Since 26 March 1992, the date of her injury, plaintiff has received temporary total disability compensation for 61.5715 weeks and temporary partial disability compensation for at least 249.4286 weeks. Combined, plaintiff has received temporary total disability compensation and temporary partial disability compensation for more than 300 weeks.
73. The period ending 300 weeks from March 26, 1992 ended on December 30, 1997. The period ending 61.5715 weeks from December 30, 1997 ended on March 6, 1999.
74. On 11 May 1999, plaintiff requested a modification of the Award in this claim.
75. Beginning 30 October 1996 plaintiff was capable of earning wages at least equal to the wages she earned from Family Dollar Stores.
76. To the extent that the Evidentiary Rulings contained in this Opinion and Award contain findings of facts, they are accepted as findings of fact as if fully set forth and incorporated herein.
 ***********
The foregoing findings of fact and conclusions of law engender the following additional
 CONCLUSIONS OF LAW
1. Plaintiff's entitlement to total disability compensation ended when she returned to work for Family Dollar Stores on October 30, 1996. G.S. § 97-29. Plaintiff's employment and ability to earn wages from that date through September 17, 1997 rebutted the presumption of total disability that arose in plaintiff's favor from the January 16, 1996 Opinion and Award. Beginning October 30, 1996, plaintiff had, at worse, a partial incapacity to earn wages equal to the wages she earned while employed by Family Dollar Stores.
2. Plaintiff's employment with Family Dollar Stores was not a trial return to work. G.S. § 97-32.1.
3. Pursuant to G.S. § 97-18(b) and the prior Opinion and Award in this claim, defendants paid plaintiff temporary total disability compensation and temporary partial disability compensation for a combined period in excess of 300 weeks. In addition, defendants paid plaintiff temporary partial disability compensation after the date 300 weeks from the date of her injury. G.S. § 97-30; Brown v. Public Works Comm.,122 N.C. App. 473, 470 S.E.2d 352 (1996).
4. The payments defendants made to plaintiff pursuant to G.S. §97-18(b) were made pursuant to an Award of the Industrial Commission. G.S. § 97-82; Calhoun v. Wayne Dennis Heating Air Cond.,129 N.C. App. 794, 501 S.E.2d 346 (1998).
5. The Award of the Industrial Commission for payment of partial disability compensation could not exceed the maximum period permitted by G.S. § 97-30. Thus, when defendants paid plaintiff temporary disability compensation for the maximum for period required by the Act, defendants satisfied the Industrial Commission's Award.
6. Having received her final payment pursuant to an Award of the Commission at the conclusion of the 300 weeks period permitted by G.S. § 97-30, plaintiff is entitled to no additional disability unless she sustained a change of condition within the meaning of § 97-47.
7. Plaintiff did not sustain a substantial change of her physical condition negatively affecting her capacity to earn wages after the final payment pursuant to the 1996 Award of the Industrial Commission. G.S. § 97-47.
8. Plaintiff is entitled to no additional disability compensation as a result of her March 26, 1992, injury.
9. Plaintiff is entitled to payment of all medical expenses incurred for treatment of the psychological diagnosis of affective mood disorder and conversion reaction she has experienced as a result of her March 23, 1992 injury for so long as such examinations, evaluations and treatments are reasonably necessary tend to affect a cure or give relief, subject to the limitations of General Statutes § 97-25.1. G.S. §§ 97-25,97-25.1.
10. Because plaintiff's psychological counselor was not familiar with conversion reaction and was not aware that plaintiff did not have a lasting or physical injury from the chemical exposure, the Full Commission orders that the parties confer and attempt to locate appropriate mental health providers who can assist plaintiff with her affective mood disorder and conversion reaction. Defendants are responsible for the treatment for the affective mood disorder and conversion reaction which are related to the 1992 chemical exposure and are not responsible for treatment for injuries and conditions that were pre-existing or otherwise are not related to the chemical exposure.
11. Defendants are not responsible for any further medical care, including prescriptions, by Dr. Guerra, Dr. Schmechel, Dr. Stopford, Dr. Inglefield, Dr. Schlesinger, Dr. Meggs, or other health care provider for any alleged physical injury from the 1992 chemical exposure. Defendants are not responsible for payment for the therapeutic vacuum cleaner prescribed by Dr. Inglefield.
12. To the extent that the Evidentiary Rulings and Burden of Proof sections of this Opinion and Order contain conclusions of law, they are accepted as conclusions of law as if fully set forth and incorporated herein.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the undersigned enters the following
 AWARD
1. Under the law, plaintiff's claim for additional disability compensation is hereby DENIED.
2. Defendants are entitled to cease payment of all disability compensation as of the August 31, 2000, deputy commissioner's decision.
3. Defendants shall pay for all medical (and psychological) expenses incurred by plaintiff for treatment of the affective mood disorder and conversion reaction she has experienced as a result of her March 26, 1992 injury for so long as such examinations, evaluations and treatments are reasonably necessary and tend to affect a cure or give relief, subject to the limitations of General Statutes § 97-25.1. Defendant are not required to pay for any further medical expenses incurred by plaintiff for allergies, asthma, incontinence, and other physical injuries that have been alleged to be related to her March 26, 1992 chemical exposure. Defendants are only responsible to pay for medical care for injuries that are related to the compensable injury and under the facts of this case those injuries are limited to affective mood disorder and conversion reaction.
4. Defendants shall pay the costs.
 S/______________ RENE C. RIGGSBEE COMMISSIONER
CONCURRING:
 S/____________ BUCK LATTIMORE CHAIRMAN
DISSENTING WITHOUT A WRITTEN OPINION:
 S/_____________ THOMAS J. BOLCH COMMISSIONER
[1] "`If it is not reasonably probable . . . that a particular effect is capable of production by a given cause . . . the evidence is not sufficient to establish prima facie the causal relation. . . .'; the Court stated that testimony showing a particular causal relation is a mere possibility or conjecture should have been excluded." Rutledge v.Tultex Corp., 308 N.C. 85, 108, 301 S.E.2d 359 (1983).
[2] It is axiomatic that the plaintiff's injury or disease must be reasonably defined before one can establish the etiology of the condition. To enable a health care provider or other expert to opine that symptoms are caused by an event without first determining the diagnosis for the injury or disease is calling for the admission of impermissible speculation and conjecture. Under proper scientific inquiry, the condition must be reasonably diagnosed before the question of etiology can be scientifically evaluated.